# EXHIBIT B

## DECLARATION OF MARCO SIMONS

I, Marco Simons, declare as follows:

1.  I am an attorney and a member of the bars of the states of Washington and California and of the District of Columbia, as well as the U.S. District Court for the District of Columbia. I am the General Counsel of EarthRights International (ERI), and served as counsel for the plaintiffs in the actions *Wiwa v. Royal Dutch Petroleum* (96 Civ. 8386)*, Wiwa v. Anderson* (01 Civ. 1909), and *Wiwa v. Shell Petroleum Development Co. of Nigeria* (04 Civ. 2665), which were litigated in this Court and the U.S. Court of Appeals for the Second Circuit until the cases settled in 2009. The facts stated herein are based on my personal knowledge and my review of files in ERI's possession. If called upon to do so, I could and would competently testify thereto.

2.  Esther Kiobel was the lead plaintiff in *Kiobel v. Royal Dutch Petroleum Co.* (No. 02 Civ. 7618), which was filed in this court in 2002. *Kiobel* proceeded on interlocutory appeal to the Second Circuit and ultimately to the U.S. Supreme Court, where it was dismissed in 2013 on extraterritoriality grounds.

3.   In 2002, this court consolidated *Kiobel* and the *Wiwa* cases exclusively for pre-trial discovery. The proceedings resulted in a large volume of document discovery and depositions, as well as other written discovery such as interrogatory responses and admissions.

4.  Throughout the discovery proceedings, Shell and SPDC were represented by Respondent Cravath, which directly produced the discovery materials from its clients to the plaintiffs. Although the documents were initially produced on paper, the deposition transcripts were generally available in electronic form. Additionally, by the time of the *Wiwa* settlement, the *Wiwa* plaintiffs' counsel had digitized all documents into a database, and it appears highly likely that Cravath did so as well.

1

5.  During the course of production in *Kiobel* and the *Wiwa* cases, the parties in both actions submitted a Stipulation and Order Regarding the Confidentiality of Discovery Materials to this Court. Apart from party names, the Stipulation and Orders in the two cases contained duplicate language and terms. The document merely constituted an agreement between the parties to maintain the confidentiality of certain designated materials produced in *Kiobel* and the *Wiwa* cases, but did not amount to a protective order. Accordingly, in the Orders this Court did not expressly make any judgments that the materials designated "confidential" in *Kiobel* and the *Wiwa* cases actually met the requirements of a protective order.

6.  According to a review of Cravath's website, the law firm has continued to serve as counsel for Shell in recent proceedings, including Shell's acquisition of BG Group in 2015.

7.  To my knowledge and based on publicly available information, Respondent Cravath is headquartered in New York City, New York, and has no business offices in the Netherlands.

8.  Attached hereto as Exhibit 1 is the Amended Complaint in *Kiobel v. Royal Dutch Petroleum Co.* (No. 02 Civ. 7618), filed in this Court as D.E. 69 on May 17, 2004.

9.  Attached hereto as Exhibit 2 is an article from Respondent Cravath's website indicating that Cravath is acting as U.S. counsel to Royal Dutch Shell in the oil company's acquisition of BG Group, which will be pursuant to an agreement between Shell and BG Group entered on April 8, 2015.

10. Attached hereto as Exhibit 3 is the Stipulation and Order Regarding Confidentiality of Discovery Materials, which the parties to *Wiwa v. Royal Dutch Petroleum* (96 Civ. 8386) filed with this Court on October 30, 2002 as D.E. 67.

11. Attached hereto as Exhibit 4 is the Stipulation and Order Regarding Confidentiality of Discovery Materials entered into the docket of *Kiobel v. Royal Dutch Petroleum Co.* (No. 02 Civ. 7618) on October 30, 2002. The filing explains that the parties to *Kiobel* and *Wiwa v. Royal*

2

1. *Dutch Petroleum* (96 Civ. 8386) agreed to consolidate discovery for the two actions and that the *Kiobel* plaintiffs agreed to be bound by the terms of Exhibit 3, the Stipulation and Order Regarding Confidentiality of Discovery Materials filed in *Wiwa*, which was attached.

I declare under penalty of perjury that the foregoing is true and correct.

Signed on this 12th day of October, 2016, at Washington, the

District of Columbia.

By:

_____

MARCO SIMONS
**EarthRights International**
1612 K Street NW #401
Washington, DC 20006
Tel: 202-466-5188 x103
Fax: 202-466-5189
marco@earthrights.org

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ESTHER KIOBEL, individually and on behalf of her late husband, Dr. BARINEM KIOBEL, BISHOP AUGUSTINE NUMENE JOHN-MILLER, CHARLES BARIDORN WIWA, ISRAEL PYAKENE NWIDOR, KENDRICKS  DORLE NWIKPO, ANTHONY B. KOTE-WITAH, VICTOR B. WIFA, DUMLE J. KUNENU, BENSON MAGNUS IKARI, LEGBARA TONY IDIGIMA, PIUS NWINEE, KPOBARI TUSIMA, individually and on behalf of his late father CLEMENT TUSIMA, and individually on behalf of all others similarly situated, | : : : : : : : : : : : : : : |
| Plaintiffs, | : : CIVIL ACTION |
| vs. | : NO. 02 CV 7618 (KMW) : |
| ROYAL DUTCH PETROLEUM COMPANY; SHELL TRANSPORT AND TRADING COMPANY, p.l.c.; and SHELL PETROLEUM DEVELOPMENT COMPANY OF NIGERIA, LTD., | : : AMENDED CLASS : ACTION COMPLAINT : : |
| Defendants. | : JURY TRIAL DEMANDED : : |

## AMENDED CLASS ACTION COMPLAINT

### Introduction

1.      This is an action brought by Plaintiffs, victims of human rights violations, who

were residents of Ogoniland, Rivers State, Nigeria during any period between January 4, 1993

and May 28,1999, individually and on behalf of those similarly situated, alleging that Defendants

Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c. (collectively,

"Shell") and/or Defendant Shell Petroleum Development Company of Nigeria, Ltd. ("SPDC"),

planned, cooperated, facilitated, assisted, conspired, recruited as agent and/or participated with

the Federal Republic of Nigeria ("Nigeria" or the "Government") in violation of Plaintiffs'

rights under the law of nations and customary international law to be free from: (1) extrajudicial

killing; (2) torture; (3) rape; (4) arbitrary arrest and detention; (5) cruel, inhuman and degrading

treatment; (6) crimes against humanity; (7) forced exile; (8) restrictions on assembly; and (9) the

destruction of private property.  Shell and SPDC conspired to and acted under Governmental

authority in a joint strategy to deploy military forces in a violent campaign to depopulate areas

for oil exploration and extraction, terrorize the civilian population for the purposes of

intimidating Plaintiffs and the Class, discourage peaceful protests against SPDC's oil exploration

and extraction activities, and allow such activities to continue in Ogoniland.

    2.    Ogoniland is an area of 650 square kilometers located in the Niger delta area of

Nigeria, within the area administratively known as Rivers State, with a population of

approximately 500,000.  Oil was discovered in Ogoniland in 1956 and a consortium lead by

Shell received the contract to develop and extract the petroleum products. Since Shell started

operations in Nigeria, Ogoniland has yielded approximately $9 billion in oil revenue. In response

to peaceful Ogoni protests against the severe environmental consequences of SPDC's oil

development, Shell and SPDC knowingly instigated, planned, facilitated, conspired and

cooperated in unprovoked attacks by the Nigerian military, including the Mobile Police and the

Rivers State Internal Security Task Force ("ISTF") against the unarmed residents of Ogoniland,

resulting in extrajudicial killing, torture, arbitrary arrest and detention, cruel, inhuman and degrading treatment, crimes against humanity, rape, forced exile and the deliberate destruction of private property. Shell and SPDC financially supported the operations of these military units directly and indirectly, including the purchase of ammunition for the Police.

3.     The Movement for the Survival of the Ogoni People (MOSOP) and its leader Ken Saro-Wiwa attempted to negotiate a peaceful resolution to the dispute with the Government, SPDC and Shell. When these negotiations failed, MOSOP organized non-violent protests to bring public attention to the plight of Ogoniland. In response, Nigeria established the Ogoni Civil Disturbances Special Tribunal (the "Special Tribunal"), a military tribunal, to supervise and administer extra-judicial punishments on persons in Ogoniland deemed to be threats to public order. Shell and SPDC bribed prosecution witnesses to secure false testimony and otherwise cooperated with the Special Tribunal which meted out punishments to hundreds of persons. Mr. Saro-Wiwa, Dr. Barinem Kiobel and other Ogoni leaders were executed following summary proceedings before the Special Tribunal in 1995.

4.     Shell and SPDC knew, should have known, or recklessly disregarded that the consequences of their conspiracy, collaboration and cooperation with the Nigerian military would include the violent acts that occurred. But they were willing to plan, aid, participate in and facilitate those acts in order to profit from Ogoniland's proven oil and gas reserves.

## JURISDICTION

5.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1350.

3

## PARTIES

6.   (a)  Plaintiff Esther Kiobel ("Plaintiff Kiobel") is a citizen of Nigeria and is currently residing in the United States.  She brings this action on her own behalf and on behalf of her late husband, Dr. Barinem Kiobel ("Dr. Kiobel").  While in Nigeria, Plaintiff Kiobel and Dr. Kiobel were, at all relevant times, residents of Rivers State.

(b)  Dr. Kiobel was born in Ogoni and educated in Scotland.  On January 24, 1994, he was appointed as Honorable Commissioner of the Ministry of Commerce and Tourism and member of the Rivers State Executive Council.  He was arrested on May 22, 1994, and detained without charge, along with Ken Saro-Wiwa and others, by the Shell supported ISTF.  In a summary proceeding before the Special Tribunal, without adequate counsel, access to witnesses or the right of appeal, in proceedings that were notoriously devoid of even rudimentary due process, he was convicted of murder and executed by the Nigerian government on November 10, 1995, in Port Harcourt, Nigeria.  His arrest, conviction and execution were: 1) in retaliation for his outspoken objection within policy making circles in the Nigerian government to "Operation Restore Order in Ogoniland," the plan to support Shell and SPDC's operations in Ogoniland by means of violent military suppression of the popular opposition; and 2) to prevent him from revealing to the public Shell's conspiracy and cooperation with the Nigerian government in the acts set forth herein.

(c)  When Plaintiff Kiobel attempted to bring food to her husband in detention at Bori Military Camp, in January 1995, she was stripped of her clothing, beaten with a high tension wire ( "koboko") whip and detained without charge.  The leader of the ISTF, Major Paul Okuntimo ("Okuntimo"), attempted to rape her.  Her hands were tied behind her back, and she

4

was tossed into the back of a truck for transportation to a village prison where she was held by

the ISTF without proper food, water or sanitary facilities for three weeks.  Due to continuing

threats against her life and her family, Plaintiff Kiobel fled Nigeria in 1996 for the United

Nations Refugee Camp in Benin until she was granted asylum by the United States in 1998.

Shortly after her departure from Ogoniland, government troops burned her house and its contents

to the ground.

      (d)   Plaintiff Kiobel's effort to be appointed Executor of her husband's estate was

stymied when Nigerian officials confiscated his last will and testament.

      7.   Plaintiff Bishop Augustine Numene John-Miller ("Bishop John-Miller") is an

Ogoni, a citizen of Nigeria and a resident of the United States.  In October 1995, Bishop John-

Miller, along with other religious leaders, was designated to meet with Government officials in

an effort to negotiate a peaceful resolution of Ogoni grievances relating to the impact of oil

exploration.  On October 28, 1995, when he arrived for the meeting, Bishop John-Miller and

other members of his delegation were detained without charge.  Bishop John-Miller was

incarcerated in a small cell with 23 other inmates.  During this detention, Bishop John-Miller

was repeatedly beaten and kicked. The local military commander, Major Obi, informed Bishop

John-Miller that he and the other religious leaders  were in detention because they allowed their

churches to be used for MOSOP meetings.  Bishop John-Miller was released on November 25,

1995, and suffered severe abdominal pain, rashes, and other injuries for more than one year

thereafter.  In April 1996, the night preceding a United Nations fact finding mission to

Ogoniland, Major Obi arrived at Bishop John-Miller's house with a truckload of soldiers.  Major

Obi told Bishop John-Miller's wife that the ISTF would severely injure Bishop John-Miller if he

cooperated with the United Nations mission.  Under orders from Major Obi, Bishop John-Miller's wife was beaten and their household ransacked.  Bishop John-Miller fled Nigeria to the United Nations Refugee Camp in Benin under threat of murder and was later granted asylum by the United States Department of State.

8.    Plaintiff Charles Baridorn Wiwa ("Plaintiff Wiwa") is the nephew of Ken Saro-Wiwa and is an Ogoni, a citizen of Nigeria and a resident of the United States.  Plaintiff Wiwa was active in the National Union of Ogoni Students as chairman of the constitution drafting committee.  He was arrested on January 3, 1996, for organizing a protest against Shell and the Nigerian government.  Upon his detention, he was taken to the Bori Market where his captors clubbed, horsewhipped, kicked and beat him for nearly two hours in front of a huge crowd including his mother, sisters and other relatives.  Government soldiers took him to the Kpor Military Detention Camp in Gokana where he was tortured through daily whippings and threats were made against members of his family.  After 5 days in the detention camp he was transferred to the State Investigation and Intelligence Bureau in Port Harcourt.  He was formally charged before the Magistrate Court 2 in Port-Harcourt with unlawful assembly.  The purported unlawful assembly was alleged to have occurred the day after his arrest.  After he was released on bail there were two attempts by Government agents to abduct Plaintiff Wiwa.  He felt his life was in danger if he remained in Nigeria.  Plaintiff Wiwa fled Nigeria and was granted refugee status.  Plaintiff Wiwa filed a complaint against the Government of Nigeria with the African Commission on Human & Peoples' Rights for the violations of international law alleged herein.  On November 15, 1999, the African Commission on Human & Peoples' Rights concluded its

examination of the facts and found the Federal Republic of Nigeria in violation of Articles 5, 6, 7(1)(c), 12(1), and (2) of the African Charter on Human and Peoples' Rights. ·

9.    Plaintiff Israel Pyakene Nwidor ("Plaintiff Nwidor") is an Ogoni, a citizen of Nigeria and a resident of the United States.  Plaintiff Nwidor is a trained Chemical Engineer and used his technical knowledge to advise Ogoni leaders of the environmental consequences of Shell's commercial oil activities in Ogoniland.  Because of these efforts to educate the community, Shell viewed him as an enemy.  On May 25, 1994, ISTF troops arrested him.  The ISTF officer in charge, Major Paul Okuntimo, saw the Plaintiff and said, "We caught you." Plaintiff Nwidor was brutally beaten on the spot with a "koboko" whip.  After the beating Major Okuntimo forced him to lay down in the sun and threatened to burn him alive with gasoline. Plaintiff Nwidor was transported to the military detention center at Bori where he was stripped naked and forced to lay in the tropical sun for hours.  He was sent to a small cell with approximately 30 Ogoni inmates without food, water or medical attention.  Major Okuntimo visited the cell daily and threatened to kill the prisoners for not allowing Shell to resume operations in Ogoniland.  He was occasionally beaten before being allowed to use the restroom. After six weeks, Plaintiff Nwidor  was subsequently transferred to the detention camp at Kpor where he was again beaten with the koboko.  He was released after his family paid bribes, but not until he signed a statement agreeing not to engage in any anti-Shell activities in the future, under penalty of death.  Plaintiff fled Nigeria in February 1996.

10.    Plaintiff Kendricks Dorle Nwikpo ("Plaintiff Nwikpo") is an Ogoni, a citizen of Nigeria, and a resident of the United States.  Plaintiff Nwikpo was involved in the planning and organizing of  a protest march against Shell and the Nigerian government on January 4, 1995, in

Wiiyaakara.  In November 1995, he was caught entering Ogoniland to prepare for the next year's

protest against Shell.  The ITSF arrested and detained him for approximately 9 hours.  While in

detention he was tortured by being beaten with a large club while handcuffed and sprayed in the

face with a chemical irritant that burned his skin, eyes, nose and throat. Plaintiff Nwikpo finally

managed to escape his captors and return to his home.  He organized and led another peaceful

protest march on January 4, 1996.  Later that night, in an effort to find him, ISTF forces attacked

his town, invaded Plaintiff Nwikpo's home, destroyed property and drove his family, including

his 75 year old father, Chief S.B. Gbene-Nwikpo, into the forest.  During the raid, Plaintiff

Nwikpo's mother was severely beaten resulting in permanent disability, his sister was raped and

his brother was abducted and tortured by injection with a chemical agent causing loss of memory

and breathing difficulty.  His brother later died from the physical deterioration caused by the

injection.  Plaintiff Nwikpo escaped to the United Nations Refugee Camp in Benin and later was

granted asylum in the United States.

     11.   Plaintiff Anthony B. Kote-Witah ("Plaintiff Kote-Witah") is an Ogoni, a citizen of

Nigeria and a resident of the United States.  He is a member of the Council of Churches, the

spiritual branch of MOSOP, where he organized prayer vigils and days of fasting to protest

Shell's destruction of Ogoniland.  On June 20, 1995, Plaintiff Kote-Witah was detained by

military troops at Nwikpeg-Kpegmaa near Bane and severely beaten and tortured.  He escaped

and, after subsequent reports that he was being sought, fled to the United Nations Refugee Camp

in Benin.  In an effort to find Plaintiff Kotah-Witah, the Nigerian military interrogated and beat

his mother, resulting in permanent disability and nerve damage.

12.   Plaintiff Victor B. Wifa ("Plaintiff Wifa") is an Ogoni, a citizen of Nigeria and a resident of the United States.  He participated in several non-violent protest marches against Shell.  In July 1995, Plaintiff Wifa was arrested and his home raided by ISTF troops.  He was brought to Kpor military camp where he was interrogated and brutally beaten.  Plaintiff Wifa was ordered to sign a document pledging never to participate in a MOSOP protest against Shell. When he refused, he was shot by his captors and suffered a broken shoulder and wounded hand. He lost one finger and is permanently disabled.  Upon his release, Plaintiff Wifa returned home to find that the ISTF troops had brutally raped his wife.  As a result, she suffers from anxiety, and emotional and psychological distress.   Plaintiff Wifa fled Nigeria and was subsequently admitted to the United States.

13.   Plaintiff Dumle J. Kunenu ("Plaintiff Kunenu") is an Ogoni, a citizen of Nigeria and a resident of the United States.  As the MOSOP Norkwiri Boue Chapter Public Affairs secretary, his duties included mobilizing the local residents for MOSOP rallies against Shell. For these activities, Plaintiff Kunenu was arrested on June 6, 1994, and detained without charge at the Kpor military camp by the ISTF.  He was brutally beaten every day in the morning and the evening with a cane, sustaining serious injuries.  While incarcerated, Plaintiff Kunenu was denied food, water and medical treatment.  He was released only after being forced to sign a pledge that he would never again participate in protests against Shell.  After his mother was beaten by troops of the ISTF, Plaintiff fled Nigeria on March 16, 1996, and obtained refuge at the United Nations Refugee Camp in Benin before being granted asylum to enter the United States in July 1999.

14.    Plaintiff Benson Magnus Ikari ("Plaintiff Ikari") is an Ogoni, a citizen of Nigeria and a resident of the United States.  In April 1993, Plaintiff Ikari participated in protests against the construction of a Shell pipeline through Ogoniland.  Shell personnel called in government troops who fired on the unarmed crowd, killing and wounding several people.  Shell security personnel then detained him and handed him over to Nigerian authorities, who detained him for three days without food.  In August 1993, Plaintiff Ikari witnessed Shell helicopters flying into Andoni, which government troops were using as a staging area for attacks later that week on Ogoni villages as part of "Operation Restore Order in Ogoniland" which resulted in hundreds of deaths.  The celebrating troops wrote on a wall on the side of the road, "Shell must stay and Saro-Wiwa must die."  Later, he was visiting the village of Eekee in September 1993 when it was attacked by the ISTF.  The troops burned houses and indiscriminately shot civilians.  Plaintiff was shot in the face by ISTF during this attack and the bullet remains lodged in his skull today.  Government troops attacked Bori in Ogoniland and Plaintiff Ikari came under fire again.  The population had fled from Bori into the bush to escape government troops who shot, maimed and arrested unarmed civilians and looted the village.  In 1995, he was detained by Nigerian police, searched, beaten, threatened with a gun and forced to sit in a pool of stagnant water for nearly an hour.  In fear of his life, he fled Nigeria for Benin and, eventually, the United States.

15.    Plaintiff Legbara Tony Idigima ("Plaintiff Idigma") is an Ogoni, a citizen of Nigeria and a resident of the United States.  He was  member of the steering committee of MOSOP and the coordinator for the Ken-Khana area.  On January 1, 1995, Plaintiff Idigima was arrested by Government troops and subsequently detained and tortured by repeated beatings with a cane over the course of four days.  He was transferred to Kpor military camp, where the

episodes of torture continued.  During his incarceration at Kpor, he was brought into a room with a Shell executive who was asked to identify Plaintiff Idigma as one of the Ogoni who had prevented Shell from working in Ogoniland.  Plaintiff Idigma avoided execution only because the Shell executive could not positively identify him.  Plaintiff Idigma's detention continued until February 21, 1995, and ended only after his wife paid a bribe  to Major Paul Okuntimo.  He subsequently fled Nigeria in fear of his life and was admitted into the United States.

16.    Plaintiff Pius Nwinee ("Plaintiff Nwinee") is an Ogoni, a citizen of Nigeria and a resident of the United States.  On September 21, 1993, his village, Kpean, was attacked by government troops.  His home was ransacked and much of Kpean was burned to the ground. Ten unarmed villagers were slaughtered in cold blood.  His cousin, Letam Biranee, who was paralyzed, could not escape and  was burned to death when the troops set fire to his home. Plaintiff Nwinee's parents and family were driven into hiding in the bush.  On January 4, 1996, he lead a protest march of approximately 5,000 Ogoni against Shell from Kpean to Ken-khana. He was arrested by ISTF troops at Wiyaakara Junction, beaten unconscious, and left for dead. Plaintiff Nwinee recovered and fled Nigeria in fear of his life.  His eyesight was severely and permanently damaged.

17.    Plaintiff Kpobari Tusima ("Plaintiff Tusima") is an Ogoni, a citizen of Nigeria and a resident of the United States.  On May 21, 1994, when four Ogoni elders were murdered in Giokoo, the ISTF was sent to Ogoniland to arrest all MOSOP activists, including Plaintiff Tusima's father, Clement Tusima. Clement Tusima was arrested on May 26, 1994, held incommunicado without charges and died in Port Harcourt prison on August 15, 1995 after suffering torture and severe medical neglect.  Plaintiff Tusima and his mother and 5 siblings lost

11

their breadwinner and suffered further when the ISTF burned their home and its contents to the ground.  Plaintiff Tusima sought refuge in Benin refuge camp and later was admitted to the United States.

18.    Defendant Royal Dutch Petroleum Company is a corporation organized under the laws of the Netherlands.  Its corporate headquarters is in The Hague, Netherlands.

19.    Defendant Shell Transport and Trading Company, p.l.c., is a corporation organized under the laws of England, with its headquarters in London, England.

20.    Shell Petroleum Development Company of Nigeria, Ltd., ("SPDC") is a corporation organized under the laws of Nigeria. Its corporate headquarters is in Lagos, Nigeria.

21.    Defendants Royal Dutch Petroleum Company and Shell Transport and Trading Company, p.l.c., are holding companies which, together, operate and control the various subsidiaries and affiliates.

22.    Shell, through its wholly owned subsidiaries, including SPDC, is a major investor in Nigeria and explores for, produces and sells energy products derived from Nigerian oil and natural gas.

23.    Shell conducts ongoing and significant business in the United States through its wholly owned subsidiary, Shell Petroleum, Inc., which is incorporated under the laws of Delaware, and which in turn wholly owns Shell Oil Company ("Shell USA"), a corporation incorporated in Delaware, and doing business in New York City, New York.

24.    Shell operates Shell Petroleum, Inc. and Shell USA as departments or agents and controls their activities.

25.    Shell wholly owns The Shell Petroleum Company, Ltd., a holding company which in turn wholly owns SPDC.  SPDC is the sole operator and 30% owner of a joint venture engaged in the exploration, refinement and extraction of petroleum products in Nigeria.  Other members of the joint venture include Nigerian National Petroleum Corp. ("NNPC"), a state-owned entity (55%), Elf (10%) and Agip (5%).  SPDC is responsible for approximately one-half of Nigeria's total oil output.  Since operations began in Nigeria in 1958, Shell has dominated and controlled SPDC.

26.    By its actions as alleged herein, Shell and SPDC, willfully conspired to recruit the Nigerian military and/or police as their collective agent to provide security services.

27.    By its actions as alleged herein, Shell willfully conspired with and  aided and abetted SPDC and the Nigerian military regime in the joint plan to carry out a deliberate campaign of terror and intimidation through the use of extrajudicial killings, torture, arbitrary arrest and detention, military assault against civilians, cruel, inhuman and degrading treatment, crimes against humanity, forced exile, restrictions on assembly and the confiscation and destruction of private and communal property, all for the purpose of protecting Shell property and enhancing SPDC's ability to explore for and extract oil from areas where Plaintiffs and members of the Class resided.

## FACTS

### Background Facts

28.    Up to and during the relevant time, the Federal Republic of Nigeria was ruled by a succession of corrupt and brutal military dictatorships.  General Ibrahim Babangida came to power in 1986.  After calling for and holding a national election as the supposed start of a return

to democracy, General Babangida apparently became dissatisfied with the result and "cancelled" the election before the tally was published.  Civil unrest forced General Babangida to resign and an interim government under Chief Ernest Shonekan was appointed.  This, however, was declared illegal by the Nigerian High Court, and in the ensuing confusion, General Sani Abacha seized power in November 1993.  Abacha used military repression to retain his office until May 1999.

  29. Ogoniland is a densely populated rural area in southern Nigeria in the area of the delta of the Niger River, and has been described as the most densely populated area in the entire continent of Africa.

  30. Nigeria produces approximately 1.7 to 1.8 million barrels per day of oil. Approximately 90% of this yield is produced in the area of the Niger Delta, which includes Ogoniland.

  31. Approximately 40% of Nigeria's oil production is exported to the United States.

  32. Oil was discovered in Ogoniland in 1956 and SPDC began oil production in that area in or about 1958.  Due to the population density, Ogoniland was a difficult place in which to conduct oil exploration and extraction activities, since it would require extensive land purchases and population resettlement would be required under ordinary circumstances.  Because the Ogoni were a disfavored minority, the Government gave Shell a green light to conduct its activities as if the Ogoni did not exist.   If a densely populated area was in the way of the shortest route of a proposed pipeline, the pipeline was built above ground, cutting through the heart of cultivated fields and villages.

33.   The Government permitted, and Shell and SPDC accepted, a near total absence of environmental controls and restrictions.  Above-ground pipelines were built through working farms and inhabited areas without protection, natural gas flarings were placed in close proximity to inhabited areas, and air and water pollution controls were virtually non-existent.

34.   During the relevant period, Shell and SPDC's close relationships with the Nigerian government and the local Rivers State government were strengthened by their "revolving door" employment policy.  Many government officials responsible for oil development subsequently joined  Shell management and vice versa.  For example, Chief Rufus Ada George, the Governor Rivers State was previously an official with SPDC; and Chief Ernest Shonekan, the interim President of Nigeria in 1993 and close associate of military dictator Sani Abacha, was a former director of SPDC; and Godwin Omene, former Deputy Managing Director of SPDC is the current Chairman of the Niger Delta Development Commission

35.   Shell and SPDC began production in Ogoniland in 1958.  It created an infrastructure consisting of over one hundred (100) wells, two refineries, a fertilizer plant and miles of pipelines.

36.   Shell and SPDC's exploration and extraction methods failed to comply with the most basic environmental standards.  Among the practices engaged in by Shell and SPDC during the course of oil exploration and extraction were uncontrolled flaring of natural gas, poor above-ground pipeline placement and maintenance, chronic oil spills and unlined toxic waste pits.  In 27 incidents from 1982 to 1992, Shell and SPDC spilled 1.6 million gallons of oil in Ogoniland.  This represented approximately 40% of Shell's total world-wide spills.

37.   These practices had catastrophic effects on the Ogoniland environment, causing persistent air, water and noise pollution and reduced agricultural yields.  The pollution contaminated the local water supply and agricultural land and killed fish, resulting in a devastating effect on the local economies, which were based largely on subsistence farming and fishing.  As the environmental catastrophe affecting Ogoniland deepened over the years, the local population began to express their displeasure in an increasingly public and organized manner.  This eventually led to the formation of MOSOP in 1990.

38.   In late October, 1990, villagers in Umuechem, a neighboring community to Ogoni, held a demonstration against pollution caused by Shell and SPDC's operations.

39.   On or about October 29, 1990, SPDC claimed that there would be an attack on October 30, 1990 on its camp site at Umuechem and requested that the Rivers State Commissioner of Police provide the Mobile Police Force for security protection.

40.   SPDC specifically requested the assistance of the Mobile Police Force, although this force, popularly known in Nigeria as the "Kill and Go Mob," was known to be "trigger happy" and commit massacres and other grave human rights violations.

41.   On or about October 31, 1990 and November 1, 1990, acting on SPDC's request, the Mobile Police Force carried out massive scorched earth operations in Umuechem resulting in the  massacre of 80 villagers and the destruction of over 495 houses.  A commission of inquiry recommended proceedings against police officials and compensation for the victims.  However, the Rivers State Attorney General, O.C.J. Okocha, refused to take any action to implement these recommendations.  Mr. Okocha later became counsel for SPDC.

16

42.    Despite learning of the results of the Umuechem operation, Shell and SPDC continued to request participation and assistance by the Mobile Police Force in Ogoniland. Similar operations were conducted in 1990 and 1991 as conditions in Ogoniland continued to deteriorate.

43.  In November 1992 MOSOP issued a demand for Shell and SPDC to pay royalties to the Ogoni people and compensate the Ogoni people for environmental damage caused by SPDC's operations. In response to this demand SPDC's officials convened meetings with the Governor of Rivers State and representatives of the Nigerian Police, Nigerian Army, Nigerian Navy and State Security Services (The Nigerian Government intelligence agency).

**Class Period Events**

44.    By January 1993, at least 300,000 Ogonis, more than half the population of Ogoniland, had participated in protests against the effects of Shell and SPDC's oil exploitation of Ogoniland and its people.  These civil disturbances and the continuing military responses increasingly threatened Shell and SPDC personnel and assets in Ogoniland.  As a result, Shell and SPDC decided to increase security for its personnel and contractors working in Ogoni to maintain ongoing oil production.

45.    Eventually SPDC's oil fields in Ogoni automatically cut off depriving both Shell and the Government of a significant source of revenue.  They therefore determined to develop a plan to restore "law and order" that would allow Shell to restart its Ogoniland operations.  On or about February 15, 1993 through February 18, 1993, Shell and SPDC officials met in the Netherlands and England to formulate a strategy to suppress MOSOP and to return to Ogoniland.

17

Based on past behavior, Shell and SPDC knew that the means to be used in that endeavor would include military violence against Ogoni civilians.

46.    On or about April 28, 1993, Shell and SPDC directed its contractor, Willbros West Africa, Inc. ("Willbros"), to begin construction of the Rumuekpe-Bomu pipeline in Ogoniland. Shell and SPDC knew, or was reckless in not knowing, that the pipeline construction would involve the bulldozing of crops and farmlands under supervision of Government armed forces.

47.    Ogoni villagers affected by the pipeline project gathered to protest peacefully the destruction of their crops and farmlands.  SPDC called in government troops who fired on the villagers, killing eleven.  SPDC employees were present during these operations.  Rather than disassociating itself with the chronically brutal actions of the Nigerian military, SPDC's divisional manager wrote to the Governor of Rivers State, a former SPDC employee, requesting "the usual assistance" to allow further work on the pipeline to continue.

48.    Thereafter, the Nigerian military provided "the usual assistance" to Shell and SPDC including: (a) attacks on August 4 -5, 1993, which resulted in the deaths of at least thirty-five residents of the Ogoni village of Kaa and the destruction of property; (b) attacks on numerous Ogoni villages in September and October 1993 following reconnaissance using a SPDC helicopter, and using SPDC boats, on ten Ogoni villages on the Andoni border. [An SPDC van carrying automatic weapons was stopped in Bori and the van and the Shell driver were apprehended by the local authorities.] This operation involved the massacre of approximately 750 Ogoni civilians and massive property destruction resulting in the displacement of 30,000 others.  During these attacks (a) Plaintiff Ikari was shot in the face by  government troops during an assault on the village of Eekee; (b) Nigerian military and police forces attacked the Ogoni

villages of Kaa and Kpean, burning the village to the ground and shooting civilians indiscriminately.  Plaintiff Pius Nwinee's house was destroyed in this attack.

49.  Shell and SPDC assisted in these attacks on Ogoni by the Nigeria military and police by: 1) providing transportation to Nigeria forces involved; 2) utilizing Shell property as a staging area for attacks; 3) providing and transporting food for soldiers involved in the attacks ; 4) providing clothing and gear to soldiers involved in the attacks; and 5) compensating the soldiers involved in the attacks.

50.  In October 1993, SPDC employees accompanied by 24 Nigerian military personnel in SPDC charter buses invaded Korokoro in an attempt to recover two vehicles abandoned by SPDC drivers.  The military fired on unarmed Ogoni villagers killing one and wounding two.

51.  On or about December 1, 1993, SPDC Managing Director Philip B. Watts, with the approval of Shell, requested the Nigerian Police Inspector General to increase SPDC's security including the immediate deployment of a new 1,200 man police force, known as the Oil Production Area Police Command, to deter and quell community disturbances.  In exchange, Shell and SPDC promised to provide complete logistical and welfare support to the Nigerian forces, including salary, housing, uniforms, automatic weapons, riot gear and vehicles.

52.  Shell and SPDC has publicly praised the co-operation from and its excellent working relationship developed over the years with the Nigerian Police Force.

53.  In early 1994, ISTF was created to "quell communal violence."  Major (later promoted to Lt. Col.) Paul Okuntimo, an officer known for his brutality and his public acknowledgment thereof, was appointed as commander.  ISTF exists only in Rivers State.

19

54.   The primary function of the ISTF was to protect SPDC's infrastructure in Ogoniland and to quell Ogoni protests so that Shell and SPDC could resume operations there. The Government gave ISTF carte blanche to use whatever methods were necessary to achieve that end. Shell and SPDC provided logistical and financial support for the operations of the ISTF, including transportation, food and ammunition despite its engagement in repeated acts of murder, torture, rape, cruel, inhuman and degrading treatment, crimes against humanity and property destruction. Shell and SPDC's financial support included cash to support ISTF operations and bribes to its commander.

55.   In April 1994, Dr. Kiobel attended a meeting of the Rivers State Executive Council in which plans for the Nigerian Constitutional Conference were discussed. At this meeting members of the Executive Council stated that Shell and SPDC were prepared to return to Ogoni but that protests against Shell must be suppressed, by violence if necessary. They unveiled a plan entitled "Operation Restore Order in Ogoniland." Dr. Kiobel objected to the use of violence by the government to suppress the peaceful protests.

56.   In April 1994, Nigerian security forces supported attacks on eight Ogoni villages and burned down the villages of Ledor on April 16 and Tumbe on April 18, 1994.

57.   On April 21, 1994, Lieutenant Colonel Komo, the Military Administrator of Rivers State implemented "Restore Order in Ogoniland" by sending a memo to the head of the ISTF detailing an extensive military presence and policy of military intervention to "sanitize" Ogoniland, in order to ensure that those "carrying out business ventures...within Ogoniland are not molested." This clearly referred to Shell and SPDC.

20

58. On May 9, 1994, Dr. Kiobel was invited to attend a Special Oil Seminar presented by SPDC to the Military Administrator of Rivers State, the Rivers State Executive Council and various Nigerian military officials. Dr. Kiobel asked SPDC officials about the Ogoni demand for royalties.

59. On May 12, 1994, Maj. Okuntimo sent a "restricted" memo to the Military Administrator declaring that "Shell operations still impossible unless ruthless military operations are undertaken for smooth economic activities to commence." The ISTF stated that it would conduct "wasting operations during MOSOP and other gatherings making constant military presence justifiable; wasting targets cutting across communities and leadership cadres especially vocal individuals in various groups; wasting operations coupled with psychological tactics of displacement; wasting as noted above." Maj. Okuntimo also suggested that pressure be exerted on Shell for "prompt regular inputs" (i.e. payments) to support ISTF operations.

60. In May 1994, Dr. Kiobel received a letter from the United States Congressional Human Rights Caucus stating in part, "We understand that the Rivers State Commissioner of Police issued a memo on April 21, 1994, outlining a plan for the Nigerian Army, Air Force, Navy, and Police to occupy the Ogoni territory to 'restore and maintain law and order in Ogoniland and apprehend intruders who may wish to use the period to ferment further disturbances.' We are concerned about the safety of the Ogoni people especially unarmed civilians... We ask you to do everything in your power to bring an end to human rights violations against the Ogoni people." He forwarded the letter to the Rivers State Military Administrator. Subsequently, he was invited to visit Gokana on May 21, 1994, to speak about the upcoming Constitutional Conference.

21

61.     When Dr. Kiobel arrived in Gokana on May 21, 1994, the scheduled meeting had
not convened and many participants had not arrived, so he left to take care of other business.  He
returned later in the day and found chaos at the meeting place with young people shouting at his
car.  He drove away to report the disturbance and later learned that four Ogoni elders had been
killed at the meeting.  The following day,  Dr. Kiobel, and eight others, including Ken Saro-
Wiwa, were arrested and detained without charge by the Nigerian military authorities and the
arrest of the entire MOSOP leadership was ordered by the Rivers State Military Administrator.
Clement Tusima was arrested and detained without charges four days later.

62.     In May through August 1994, the ISTF mounted numerous nighttime raids on at
least sixty towns and villages in Ogoni, to punish entire communities for their opposition to Shell
and SPDC.  During these raids, the military broke into homes, shooting or beating anyone in
their path, including the elderly, women and children, raping, forcing villagers to pay "settlement
fees," bribes and ransoms to secure their release, forcing villagers to flee and abandon their
homes, and burning, destroying or looting property.  At least fifty Ogoni were killed and several
thousand were arrested and detained at ISTF detention facilities at the Bori military camp and
the Kpor police station, among other locations.

63.     Conditions of detention were extremely brutal.  Women were beaten and men were
flogged.  Medical care, food and sanitary facilities were below any minimal standards of
decency.  Clement Tusima was denied proper medical care for his diabetes, and his condition
gradually worsened.  Despite frequent requests, the inadequate or non-existent medical care
continued for many months.  When he was finally sent to a hospital for medical care, he was
chained to his bed and returned to prison before the completion of such care.  His illness again

22

worsened until he became unconscious.  When he was finally returned to a hospital, it was too late and he died.  Since no formal charges were typically filed and no civilian court system existed for the detainees, there was no established way to secure release other than the payment of bribes to ISTF officials.

64.   SPDC officials frequently visited the ISSTF detention facility at AFAM and regularly provided food and logistical support for the soldiers.

65.   In November, 1994, the Special Tribunal was created and specially appointed by the Nigerian military regime to try Dr. Kiobel and his fellow prisoners for the May 21, 1994 murder of four Ogoni elders.

66.   On March 18, 1995, the Special Tribunal assumed jurisdiction over the cases of ten additional Ogoni leaders who were formally charged with murder on April 7, 1995.

67.   The procedures governing the Special Tribunal allowed and authorized:

    a.    the death penalty for acts committed before the Special Tribunal was formed;

    b.    Execution of sentences, including the death penalty, before review by a higher court or authority;

    c.    Meetings between the accused and  their counsel only with the permission of and in the presence of a military officer;

    d.    Trial without representation by counsel.

68.   Defense counsel for and family members of the accused were subjected to actual or threatened beatings or other physical harm.  Among other victims of this were Plaintiff Kiobel who was the victim of an attempted rape by Major Okuntimo.

23

69. The accused were denied adequate food and medical care, beaten and subjected to other torture.

70. Shell was actively involved in the Special Tribunal proceedings against Dr. Kiobel and the other eight accused in the following ways, among others:

a) Shell and SPDC bribed witnesses to give false testimony before the Special Tribunal. Acting through its agent, Alhaji M. Kobani, Shell and SPDC offered significant payments to individuals who had given previous statements to the police that did not implicate the accused to sign new statements, prepared by Government officials, claiming that the accused were responsible for the murders of the four Ogoni elders. In fear of retribution, many of the witnesses signed such a statement and were paid by Shell and SPDC.

b) Shell and SPDC participated in various witness preparation sessions in which witnesses were instructed on what to say and what not to say.

c) Shell and SPDC participated in a reception for the witnesses shortly before the trial.

d) An official SPDC representative attended the trial.

71. On January 4, 1995, Nigerian military forces violently dispersed peaceful demonstrations protesting Shell's operation and the arrest of Saro-Wiwa, Dr. Kiobel and the others with shootings and beatings and arrests.

72. Those unlawfully detained as a result of the January 4, 1995, protest were subjected to floggings, beatings and other torture and money was extorted to obtain releases.

73. Brian Anderson, the Managing Director of SPDC, met with Owens Wiwa and offered to trade Ken Saro-Wiwa's freedom for an end to the international protests against Shell.

24

74.   On or about October 30 and 31, 1995, Dr. Kiobel and the other Ogoni leaders arrested with him were condemned to death by the Special Tribunal.  The sentences were carried out on November 10, 1995, despite a deluge of international criticism.

75.   At all times relevant herein, Shell and SPDC knew or should have known that the Nigerian regime, its army and police committed human rights abuses, including summary executions, in connection with the exploitation of oil in Ogoniland.

76.   The acts described herein were inflicted under color of law and under color of official authority, and/or in conspiracy with or on behalf of those acting under color of official authority.

77.   As a direct and proximate result of Shell and SPDC's unlawful conduct, Plaintiffs have suffered and will continue to suffer harm including pain and suffering, and extreme and severe mental anguish and emotional distress.

78.   Any suit against Shell and in Nigeria would be impossible as a practical matter and would result in serious reprisals.  In 1998, the United Nations Commission on Human Rights concluded that the Nigerian judiciary lacks independence and that its orders are ignored, delayed or disobeyed.   Indeed, General Abacha had enacted a decree removing jurisdiction from the courts of claims seeking redress against the Government for human rights violations.  In May 2002, before proceeding to issue a ruling on the merits of a complaint that Ogoni rights under international law had been violated, the African Commission on Human and Peoples' Rights (the "Commission") concluded that there was no available judicial forum in Nigeria to consider such claims.   Plaintiffs fled Nigeria in fear of their lives and could not safely return there.

25

79.   On May 22, 2002, the Commission, acting under the auspices of the Organization for African Unity, issued a formal ruling finding that Nigeria had violated various provisions of the African Charter on Human and Peoples' Rights in its acts and treatment of the Ogoni people during the Class Period alleged here.  During the proceedings, the newly installed civilian government of Nigeria submitted a *note verbale* which acknowledged: "there is no denying the fact that a lot of atrocities were and are still being committed by the oil companies in Ogoni Land and indeed in the Niger Delta area."  In the course of its ruling, the Commission concluded:

a)   "the Nigerian Government has given the green light to private actors, and the oil Companies in particular, to devastatingly affect the well-being of the Ogonis;"

b)   "The government has destroyed food sources through its security forces and State Oil Company; has allowed private oil companies to destroy food sources . . ."

80.   At all times relevant hereto, Shell and SPDC directed, participated, assisted, aided and abetted, cooperated with or conspired with, the Government in its violations of customary international law to suppress the Ogoni.  Shell and SPDC intertwined itself with the acts of the Government in the following ways among others:

a.   Shell and SPDC, directly or indirectly, imported arms for and made payments to the military, police, and/or other security personnel whose function was to facilitate Shell and SPDC operations Ogoniland;

b.   Shell and SPDC monitored and exchanged intelligence with the Nigerian military, police, and/or other security personnel whose function was to facilitate Shell's operations in Ogoniland;

26

c.   Shell and SPDC provided logistical and transportation services, including the use of SPDC helicopters, boats and vehicles, by the Nigerian military, police, and/or other security personnel whose function was to facilitate SPDC's operations in Ogoniland;

d.   Shell and SPDC participated in the planning and coordination of "security operations" including raids and terror campaigns conducted in Ogoniland and participated in regular meetings with agents and officials of the local security forces;

e.   Shell and SPDC cooperated and assisted in the extrajudicial proceedings engaged in by the Government including the arbitrary arrests and detentions of Ogonis by the ISTF and bribing witnesses to procure false testimony in the proceedings before the Special Tribunal.

## CLASS ACTION ALLEGATIONS

81.   Plaintiffs bring this action individually and on behalf of a Class consisting of all ethnic Ogoni  who resided in Ogoniland during the period January 4, 1993 to May 28, 1999 and have been injured by the course of conduct set forth herein and their heirs.  Plaintiffs seek certification pursuant to Rule 23(b)(3), Fed. R. Civ. P.

82.   The members of the Class are so numerous and that joinder of all members is impracticable.  Thousands of Ogoni have been victimized by the actions of Shell and SPDC as set forth herein.

27

83.    There are questions of fact or law which are common to the Class, including:

(a)  whether Shell, SPDC, the Nigerian military and the Nigerian Police Force cooperated, conspired, aided and abetted or acted jointly or in concert to deploy military forces in violent attacks against Ogoni civilians to facilitate SPDC's oil exploration and extraction activities;

(b)  whether Shell's acts, including those by its agents and co-conspirators, the Nigerian military, Nigerian Police Force and SPDC, as set forth herein constitute violations of customary international law or the law of nations;

(c)    whether SPDC's acts, including those by its agents and co-conspirators, the Nigerian military, Nigerian Police Force and SPDC, as set forth herein consitute violations of customary international law or the law of nations;

(c)  whether this Court has jurisdiction over the claims of the Class against Shell;

(d)  whether this Court has jurisdiction over the claims of the Class against SPDC;

(d)  whether Shell should be subjected to awards of compensatory or punitive damages and the proper measure thereof.

(e)  whether SPDC should be subjected to awards of compensatory or punitive damages and the proper measure thereof.

84.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs lived in Ogoniland, are members of the Class, and were subjected to the violations of international law alleged herein.

28

85.     Plaintiffs will fairly and adequately protect the interests of the Class in that their interests are fully aligned with those of the Class and they have retained counsel who are experienced in international human rights and class action litigation.

86.     The questions of law or fact which are common to the Class, as set forth in ¶ 84, predominate over any questions affecting individual members since all Class members lived in the same small region of Nigeria and were subjected to the same course of conduct.

87.     A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.

## COUNT I

### Customary International Law: Extrajudicial Killings (Plaintiff Kiobel)

88.     The allegations set forth in paragraphs 1 through 87 of this Complaint are incorporated by reference as if fully set forth herein.

89.     The utilization of the Special Tribunal under the conditions and procedures described herein to assess and administer capital punishment violates customary international law.

90.     Shell and SPDC conspired together and with the Nigerian Military Government to facilitate, participate in, aid and abet in, cooperate with the actions of the Special Tribunal and are therefore legally responsible.

91.     Plaintiff Kiobel and similarly situated members of the Class have been injured by Shell and SPDC's actions as described in this Count I.

29

## COUNT II

### Customary International Law: Crimes Against Humanity (All Plaintiffs)

92.    The allegations set forth in paragraphs 1 through 91 of this Complaint are incorporated by reference as if fully set forth herein.

93.    The acts described herein against Plaintiffs constitute crimes against humanity, in violation of customary international law which prohibits acts such as extrajudicial killing, arbitrary arrest and detention, rape, torture or beatings under color of state law, property destruction, forced exile and other similar acts committed as part of a systematic assault against an identifiable population group.

94.    Shell and SPDC facilitated, participated in aided and abetted in, cooperated with and/or conspired with State actors in the commission of crimes against humanity committed against Plaintiffs and are therefore legally responsible for such acts.

95.    Plaintiffs and the Class have been damaged by Shell and SPDC's actions as described in this Count II.

## COUNT III

### Customary International Law: Torture/Cruel, Inhuman and Degrading Treatment (All Plaintiffs)

96.    The allegations set forth in paragraphs 1 through 95 of this Complaint are incorporated by reference as if fully set  forth herein.

97.    The physical and psychological punishment administered to Plaintiffs, as described herein, constitutes torture and/or cruel, inhuman and degrading treatment in violation of customary international law.

98.   Shell and SPDC conspired together and facilitated, participated in, aided and abetted in, cooperated with, recruited as agents and/or conspired with State actors, in the administration and infliction of torture and/or cruel, inhuman and degrading treatment to Plaintiffs and the Class and is therefore legally responsible for such acts.

99.   Plaintiffs and the class have been damaged by Shell and SPDC's actions as described in this Count III.


## COUNT IV

### Customary International Law: Arbitrary Arrest and Detention
### (Plaintiffs Dr. Kiobel, Bishop John-Miller, Wiwa, Nwidor, Nwikpo, Kotah-Witah, Wifa, Kunenu, Idigima and Tusima)

100.   The allegations set forth in paragraphs 1 through 99 of this Complaint are incorporated by reference as if fully set forth herein.

101.   The arrests and detention of the Plaintiffs named in this Count IV were arbitrary, lacked minimal procedural safeguards, were effectuated for the purpose of facilitating Shell's operations in Ogoniland and thereby were in violation of customary international law.

102.   Shell and SPDC conspired together and facilitated, participated in, aided and abetted in, cooperated with, recruited as agents and/or conspired with SPDC and State actors in the arbitrary arrests and detention of Plaintiffs and the Class and is therefore legally responsible for such acts.

103.   Plaintiffs and the Class have been damaged by Shell and SPDC's actions as described in this Count IV.

## COUNT V

### Customary International Law:  Rights to Life, Liberty, Security and Association
### (Plaintiffs Bishop John-Miller, Dr. Barinem Kiobel, Wiwa, Nwikpo, Kunenu and Tusima)

104.  The allegations set forth in paragraphs 1 through 103 of this Complaint are incorporated by reference as if fully set forth herein.

105.  The beatings, shooting, arrests and detention of Plaintiffs by military personnel during peaceful demonstrations relating to Shell's activities in Ogoniland, as described herein, constitute violations of the right to life, liberty and security of person, and her rights to peaceful assembly and association.

106.  The arrest, detention, and executions of Ken Saro-Wiwa and John Kpuinen were violations of their rights to life, liberty, security, and freedom of association in violation of customary international law.

107.  Shell and SPDC conspired together and facilitated, participated in, aided and abetted in, cooperated with, recruited as agents and/or conspired with State actors in the violations complained of in this Count V and is therefore legally responsible for such acts.

108.  Plaintiffs and the Class have been damaged by Shell and SPDC's actions as described in this Count V.

## COUNT VI

### Customary International Law: Forced Exile (All Plaintiffs)

109.  The allegations set forth in paragraphs 1 through 108 are incorporated by reference as if fully set forth herein.

110. Plaintiffs were forced to leave Ogoniland and Nigeria in fear of their lives or personal safety, or the lives and personal safety of their family members. Plaintiffs' exile was a natural and intended consequence of the acts of the Nigerian military in support of Shell's operations in Ogoniland.

111. The use of unrestrained military violence and extrajudicial punishments on Plaintiffs, their family members and other members of their community with the intent to cause Plaintiffs to leave permanently their residences and their homeland, as described herein, constitutes forced exile in violation of customary international law.

112. Shell and SPDC conspired together and facilitated, participated in, aided and abetted in, cooperated with, recruited as agents and/or conspired with State actors in causing Plaintiffs and the Class to seek refuge outside of Ogoniland and Nigeria.

113. Plaintiffs and the Class have been damaged by Shell and SPDC's actions as described in this Count VI.


## COUNT VII

### Customary International Law: Property Destruction
### (Plaintiffs Kiobel, Bishop John-Miller, Nwikpo, Dedda and Tusima)

114. The allegations set forth in paragraphs 1 through 113 of this Complaint are incorporated by reference as if fully set forth herein.

115. The wanton destruction of Plaintiffs' real and personal property, directed at a distinct ethnic group, as described herein, constitutes discriminatory confiscation and destruction of property in violation of customary international law.

33

116. Shell and SPDC conspired together and were directly involved in such destruction (including through their contractor Willbros) and facilitated, participated in, aided and abetted in, cooperated with, recruited as agents and/or conspired with State actors in such destruction and confiscation and is therefore legally responsible for such acts.

117. Plaintiffs and the Class have been damaged by Shell and SPDC's actions as described in this Count VII.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREAS, Plaintiffs, individually and on behalf of the Class, pray for relief as follows:

A.   the certification of this action as a class action under Rule 23(b)(3), with Plaintiffs as class representative;

B.   an award of compensatory and punitive damages against Shell and SPDC sufficient to compensate Plaintiffs and the Class for their injuries and losses and to punish Shell and SPDC for their reprehensible conduct;

C.   for such other and further relief as may be in the interests of justice.

Dated:   May 14, 2004

Respectfully submitted,

BERGER & MONTAGUE, P.C.

Stephen A. Whinston
Carey R. D'Avino (CD2973)
Keino R. Robinson
1622 Locust Street
Philadelphia, PA 19103
Tel:    (215) 875-3000
Fax:    (215) 875-3053

CERTIFIED AS A TRUE COPY ON
THIS DATE____7/27/2004____
BY_____
        ( ) Clerk
        (X) Deputy

379192_01.wpd

35

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that a copy of the foregoing Amended Class Action Complaint was served via Federal Express to:

Rory O. Millson, Esquire
Cravath, Swaine & Moore
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7474

May 14, 2004

Carey R. D'Avino